**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SYSTEM TWO SECURITY, INC., | |
| *Plaintiff,* | |
| | Case No. 1:26-cv-5540 |
| *v.* | |
| AARON MOG, | |
| *Defendant.* | |

**DECLARATION OF ROBERT FLY IN SUPPORT OF PLAINTIFF SYSTEM TWO
SECURITY, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

I, Robert Fly, declare as follows:

1.      I am the Chief Executive Officer of Plaintiff System Two Security, Inc. ("STS").  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief, and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      STS provides a variety of services in the field of cybersecurity, including tools for detecting, identifying, and rectifying online and cyber threats.  STS helps clients build, manage, and share tools to quickly handle cyber threats.

3.      On or about September 25, 2024, STS hired Aaron Mog ("Mog") as STS's Field Chief Information Security Officer.

4.      As STS's Field Chief Information Security Officer, Mog served in a senior external-facing role representing the company to customers, partners, prospects, and the broader cybersecurity community, including helping grow and promote STS's DETECTIONS.AI

community presence and brand initiatives. Mog also provided strategic input regarding STS's products, platform capabilities, and market positioning.

5.     Mog had access to STS's most sensitive and confidential information, including proprietary information relating to the company's products, customers, and business operations.

6.     On or about September 25, 2024, Mog and STS signed Mog's Employment Offer agreement in which Mog agreed to be an at-will employee of STS. A true and correct copy of the Employment Offer agreement is attached as **Exhibit A**.

7.     The same day, Mog and STS signed the Employee Confidentiality & Invention Agreement (the "Invention Agreement"). A true and correct copy of the Invention Agreement is attached as **Exhibit B**.

8.     The Invention Agreement states that all "Proprietary Information" – a defined term which includes all of STS's confidential or proprietary, technical or nontechnical information" – is the sole property of STS. Ex. B § 4.

9.     The Invention Agreement prohibits disclosure of Proprietary Information by Mog to third parties, *id.*, or of any password or key by Mog to any third party, *id.* § 2.

10.     The Invention Agreement also provides that during Mog's employment and after the termination thereof, Mog agreed not to disparage STS, its products, services, agents, employees, officers, directors, or affiliates. *Id.* § 15.

11.     In addition, the Invention Agreement assigns from Mog to STS all:

discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress.

*Id.* §§ 5, 7.

2

12. The Invention Agreement also requires Mog, upon termination of his employment, "return all materials" to STS. *Id.* § 11.

13. The Invention Agreement provides for injunctive relief, specific performance, and other relief that is proper. *Id.* § 16. If Mog violates the Invention Agreement, it states that STS "will suffer irreparable and continuing damage for which money damages are insufficient" and that STS "shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate), to the extent permitted by law." *Id.*

14. The Invention Agreement is governed by California law. *Id.* § 18. All controversies, disputes, or claims arising out of or relating to the Invention Agreement, or Mog's employment with STS, are subject to binding arbitration administered by JAMS pursuant to its Employment Arbitration Rules & Procedures. *Id.* But the Invention Agreement explicitly states that "System Two Security may apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim or a conservatory relief, as necessary, without breach of this arbitration agreement and without abridgement of the powers of the arbitrator." *Id.*

15. Mog further agreed in the Invention Agreement that his employment was on an "at-will" basis and that STS could terminate his employment at any time, with or without cause and with or without notice. *Id.* § 19.

16. In or around November 2024, STS – together with Mog as a company officer – developed the idea for a new brand named DETECTIONS.AI.

17. Upon information and belief, on November 11, 2024, Mog, in his role as Field Chief Information and Security Officer, registered the Domain Name though the registrar Go Daddy and created and maintained the username and password to access the Go Daddy account

3

that held the Domain Name. A WHOIS report, attached as **Exhibit C**, confirms the Domain Name was registered on November 11, 2024.

18.     Mog was an officer and employee of STS when he registered the DETECTIONS.AI trademark and advised STS that he registered the Domain Name.

19.     In March 2025, Mog changed the domain name server ("DNS") records to STS's DETECTIONS.AI-branded website and reported doing so to others at STS via an instant message. A true and correct screen capture of Mog's message is included below.



20.     From about March 2025 to approximately April 2026, STS and Mog created and updated the website at the Domain Name without incident. STS employees adopted and used (and to this day continue to use) email addresses related to the Domain Name such that STS's email addresses read "@detections.ai."

21.     As a part of the DETECTION.AI brand development, Mog and STS hired a design firm to create the DETECTIONS.AI logo, and Mog submitted an expense report for this work. A true and correct screen capture of that expense report is included below.

4



22. In addition, the Company registered and advertises its businesses through a LinkedIn account named DETECTIONS.AI, which account has more than 9,400 followers. A true and correct printout of the public-facing DETECTIONS.AI LinkedIn page is attached as **Exhibit D**.

23. In addition, the DETECTIONS.AI trademark has been discussed in various media. For example, the DETECTIONS.AI trademark was featured in the April 29, 2026 "CyberBites" podcast, which has more than 22,000 views in nearly two weeks. *See* CyberBytes: The Podcast,

*Why Detection Engineering Is Ready for Reinvention - detections.ai* (YouTube, Apr. 29, 2026), *https://www.youtube.com/watch?v=OVHoN0U1_ck&list=PLcuPi7wDfadbKpyWmUFCFSmLU U-H1tq7J&index=2*.

24. In early May 2026, following escalating leadership and operational disagreements, STS's Board of Directors decided to terminate Mog's employment pursuant to the parties' at-will employment relationship.

25. On May 5, 2026, STS terminated Mog's employment.

26. During discussions about Mog's termination, STS requested Mog provide the username and password to access the Domain Name. Mog refused.

27. Referencing the Domain Name, Mog told me he was willing to "burn it to the ground" or "bring it to a competitor." Mog further said to me, "you should have known better Robert. You know I like to buy domains."

28. Mog then stated in a May 5, 2026 email to STS, which was forwarded to me, that he "created and drove much of [the] work" related to the DETECTIONS.AI trademark and brand, "including providing the brand and domain." Despite claiming he "provid[ed] the brand and domain," Mog claimed in the same email that the Domain Name was owned by a different entity, but he nevertheless offered to transfer the Domain Name to STS in "a one-time acquisition under a fair agreement that reflects the asset's strategic importance, current use, user base, and replacement risk." A true and correct copy of Mog's May 5, 2026 email is attached as **Exhibit E**.[1]

29. On May 7, 2026, Mog stated by email to me and others at STS that any offer to sell the Domain Name was separate from discussion of his severance for the termination of his employment, offering to sell the Domain Name to STS for $375,000:

---

[1] This and certain other emails attached to this declaration include redactions for attorney-client privilege.

> **detections.ai Domain**
>
> The detections.ai domain is owned by a separate legal entity and is not part of my employment separation.
>
> If the company wants to acquire the domain, the purchase price is **$375,000**.
>
> I will provide a domain purchase agreement and invoice. Once payment is received, the domain will be released/transferred according to the agreement.

A true and correct copy of Mog's May 7, 2026 email is attached as **Exhibit F**.

30.     When STS did not respond to Mog's offer, on May 9, 2026, Mog sent another email to me and others at STS.  In his email, Mog increased the purported sale price for the Domain Name to $450,000:

> The detections.ai domain is owned by a separate legal entity. It was not part of my employment. It will not be transferred to S2S without fair compensation.
>
> At this point, I am no longer interested in negotiating severance as a separate matter. The clean path forward is for S2S to acquire the detections.ai domain and related rights through a one-time commercial purchase.
>
> The cost is $450,000. This price is good until Sunday.

A true and correct copy of Mog's May 9, 2026 email to STS is attached as **Exhibit G**.

31.     That same day, Mog sent a separate email to STS's advisors, investors, and potential customers with the ominous title "End of detections.ai". That email was then passed along to me by one of the recipients. On information and belief, **Exhibit H** is a true and correct copy of Mog's May 9, 2026 email to STS's advisors, investors, and potential customers.

32.     On May 11, 2026, I sent an email on behalf of STS in an attempt to reach an amicable resolution by requesting Mog transfer the Domain Name. Instead, Mog, now claiming he was "the domain owner's authorized representative" (but failing to identify the "owner"), again demanded $450,000 for "a one-time acquisition of detections.ai":

> As the domain owner's authorized representative, my position is final: **$450,000** and a one-time acquisition of detections.ai.

7

A true and correct copy of my May 11, 2026 email and Mo's response is attached as **Exhibit I**.

33.     On information and belief, Mog continues to control and purport to own the Domain Name, and STS has no way to change, access, or control the website on which its own Domain Name appears.


I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on this 13th day of May 2026, in Moraga, California.

                                    Robert Fly

8